1

2

3

4

5

6

7

8

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   UNIRAM TECHNOLOGY, INC,                No   C-04-1268 VRW

13          Plaintiff,                      ORDER

14          v

15   TAIWAN SEMICONDUCTOR
     MANUFACTURING COMPANY
16
            Defendant.
17   _____/

18

19          UniRAM Technology, Inc ("UniRAM") filed suit on March 31,

20   2004, alleging, inter alia, that Taiwan Semiconductor Manufacturing

     Company ("TSMC") infringes UniRAM's United States Patent no
21
     6,108,229 (the "'229 patent"), which relates to dynamic random
22
     access memory ("DRAM") and methods for the manufacture thereof.
23
     Doc #16 (SAC).   TSMC denies the allegations and, as an affirmative
24
     defense, asserts that the '229 patent is unenforceable due to
25
     inequitable conduct.   Doc #27.
26
     //
27
     //
28

United States District Court
For the Northern District of California

1    TSMC has moved for summary judgment that the '229 patent

2    is unenforceable due to inequitable conduct.  Doc #271.  UniRAM has

3    moved to strike portions of TSMC's reply brief or, in the

4    alternative, to submit a surreply brief.  Doc #319.  For reasons

5    discussed below, the court DENIES TSMC's motion for summary

6    judgment and DENIES UniRAM's motion to strike.

7

8                                    I

9         This motion concerns the '229 patent, which issued on

10   August 22, 2000, to Dr Jeng-Jye Shau ("Shau").  Doc #272, Ex C

11   ('229 patent).  The patent discloses a DRAM cell array that is

12   manufactured by processes typically used to produce logic devices

13   such as CPUs and microprocessors.  See id.  The '229 patent is a

14   continuation-in-part both of application no 08/805,290 (the "'290

15   application") and application no 08/653,620 (the "'620

16   application").  Id at TSMC 345.  In patent parlance, the '290

17   application is the "grandparent" and the '620 application is the

18   "parent" of the '229 patent.

19        The research leading up to the '229 patent began in May

20   1996, when Shau started work on a tape-out file corresponding to

21   the DRAM architecture he was developing.  Doc #297 (Shau decl), ¶

22   7.  Shau also began simulating the performance of his architecture

23   using software-based tools that model the performance

24   characteristics of integrated circuits before they are

25   manufactured.  See id.  Using these tools, Shau asserts he

26   established that, employing the design rules of 0.6 μm technology,

27   his DRAM design had an access time of four nanoseconds.  Id.

28   //

                                    2

**United States District Court**
For the Northern District of California

On May 24, 1996, after obtaining these results from the simulation, Shau filed the '620 patent application (the grandparent patent).  Doc #271, Ex A ('620 application).  In a section summarizing the invention, Shau stated that his "results show that a memory of the present invention is faster than an SRAM of the same memory capacity."  Id, Ex A at TSMC 36.  More specifically, in describing the invention, Shau stated the following:

> A memory device of the present invention is under production.  Using 0.6 micron technology to build a memory array containing one million memory cells, we are able to achieve 4 ns access time, which is more than 10 times faster then [sic] existing memories [sic] devices of the same storage capacity.

Id, Ex A at TSMC 48.

Later in the summer of 1996, Shau completed his initial tape-out and contracted with a fabrication service called MOSIS, a low cost semiconductor manufacturer commonly used by academics for non-commercial research efforts.  Doc #297, ¶ 12.  Because MOSIS could only support small test chips, Shau was unable to verify his DRAM architecture on a full size commercial chip.  Id, ¶ 13.  As a result, Shau presented his technology to TSMC and secured permission to submit his tape-out to one of TSMC's fabrication facilities.  Id, ¶ 14.  Shau did so in late 1996, submitting a tape-out for a product that was configured as an industry standard commercial memory product — i e, a CacheRAM design.  Id, ¶¶ 14-15.  In early 1997, TSMC manufactured a prototype for Shau using his tape-out.  Id, ¶ 16.  Although the first prototype had errors, Shau asserts he was able to "bypass those errors for purposes of establishing that [he] could read and write data to the memory cells in a memory array."  Id, ¶ 17.

**United States District Court**
For the Northern District of California

Upon fabrication of the prototype, Shau filed the '290 patent application (the parent patent).  Doc #272, Ex B ('290 application).  In this application, Shau stated the following:

> Using this memory cell 1400 and a memory architecture disclosed in this invention and in our previous patent application, commercial memory products were manufactured successfully.

Id, Ex B at TSMC 220.

TSMC claims that the above statements in the '620 and '290 patent applications constitute material misrepresentations that Shau made with an intent to deceive the patent office.  TSMC has moved for summary judgment that the '229 patent is unenforceable due to inequitable conduct committed during the prosecution of the parent applications of the '229 patent.  Doc #271.

## II

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  When the moving party has the burden of

**United States District Court**
For the Northern District of California

proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.  <u>Calderone v United States</u>, 799 F2d 254, 258-59 (6th Cir 1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists.  <u>TW Elec Serv v Pacific Elec Contractors Ass'n</u>, 809 F2d 626, 630 (9th Cir 1987).  The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 US at 255.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id at 249.

III

A party seeking to have a patent declared unenforceable has a heavy burden to meet, <u>Hoffmann-La Roche, Inc v Promega Corp</u>, 323 F3d 1354, 1359 (Fed Cir 2003), especially within the posture of a summary judgment motion.  As a threshold matter, inequitable conduct requires "misrepresentation or omission of a material fact, together with an intent to deceive the PTO."  <u>Hoffmann-La Roche</u>, 323 F3d at 1359.  Both materiality and intent must be demonstrated by clear and convincing evidence.  <u>Manville Sales Corp v Paramount Sys, Inc</u>, 917 F2d 544, 552, 16 (Fed Cir 1990).  Additionally, because the allegations in the present action concern statements in grandparent and parent applications, TSMC must prove an "immediate

5

United States District Court

For the Northern District of California

and necessary relation" between the inequitable conduct in the earlier patents and the enforcement of the descendent patent. Hoffmann-La Roche, Inc v Promega Corp, 319 F Supp 2d 1011, 1021-26 (ND Cal 2004).  If the requisite levels of materiality and intent are established, the court must determine whether the equities warrant a conclusion that the patentee has engaged in inequitable conduct.  Monsanto Co v Bayer Bioscience N V, 363 F3d 1235, 1239 (Fed Cir 2004) (citing Hoffmann-La Roche, 323 F3d at 1359).

A

In asserting misrepresentations in the '620 application (the grandfather patent), TSMC focuses on the following characterization of the invention:

> A memory device of the present invention is under production.  Using 0.6 micron technology to build a memory array containing one million memory cells, we are able to achieve 4 ns access time, which is more than 10 times faster then [sic] existing memories [sic] devices of the same storage capacity.

Doc #271, Ex A at TSMC 48.

TSMC contends this representation to the patent office in May 1996 grossly overstates the production status of Shau's invention.  In support, TSMC points to Shau's deposition, in which Shau testified that he worked at Intel until the end of April 1996 and did not start to develop the claimed inventions described in his patent applications before May, when he created his own company (Telesis).  Doc #285, Ex A (Shau depo) at 202:5-204:3.  Indeed, Shau agreed that he "came up with all the ideas and prepared the entire application and got it on file all within that month's [May] time."  Id, Ex A at 203:10-14.  In view of this timetable, TSMC

United States District Court
For the Northern District of California

contends that Shau could not have generated a "product"; nor could the invention have been "under production."  Doc #271 at 5.  Shau allegedly confirmed that his invention was not "under production" in the following deposition testimony:

TSMC:     * * * As of May 24, 1996, was anyone producing chips according to the ideas of the patent application?
                    * * *
Shau:     I think to the best of my knowledge, no one did that.
                    * * *
TSMC:     When you say "anybody ever did that," ever produced chips according to the May 24, 1996, patent application?

Shau:     Before that day, I don't know anyone.

Doc #285, Ex A at 210:5-10, 210:24-211:2.

UniRAM asserts that TSMC generates inconsistency in Shau's patent application and deposition testimony by inappropriately assuming that the term "under production" is synonymous with the manufacture of "chips."  Doc #295 at 6.  According to UniRAM, the production process for semiconductor chips falls into two distinct stages:  circuit design and circuit manufacturing.  Id.  Hence, Shau's memory device was "under production," despite being at the design and simulation stage.  Id.  In support of this broader construal of the term "under production," UniRAM submits the declaration of Dr Carl Sechen, a professor of electrical engineering at the University of Texas at Dallas.  Doc #296.  Sechen asserts that a person of ordinary skill in the art would understand the statement that a "memory device" is "under production" to include the circuit design process.  See id, ¶¶ 6-9.

//

7

United States District Court
For the Northern District of California

With respect to Shau's purported results (4 nanosecond access time), Sechen's declaration states that Shau's simulation-based results were precisely the type of results generated by circuit designers in the course of their work.  Id, ¶¶ 8-9.  Because fabrication is so costly, the integrated circuit design industry relies extensively on these simulation tools to predict the performance a semiconductor chip will have once fabricated.  See id, ¶ 9.

To account for Shau's reference to a "product," UniRAM similarly contends that, from a circuit designer's perspective, the term would refer to the design specifications or tape-out, not a fully fabricated semiconductor chip.  Doc # 295 at 8.  See also Doc #296, ¶ 16 ("From a circuit designer's perspective, the term 'product' in the passage 'the bit line structure used in our product' would logically refer to the circuit design or potentially even a tape out.").

Turning to the '290 application (the parent patent), TSMC focuses on the following representation to the patent office:

> Using this memory cell 1400 and a memory architecture disclosed in this invention and in our previous patent application, commercial memory products were manufactured successfully.  The major advantage of the logic memory cell 1400 is that it can be manufactured using standard logic technology.  The resulting memory product achieved unprecedented high performance.

Doc #272, Ex B at TSMC 220.

TSMC claims that a "commercial memory product" with "unprecedented high performance" did not exist at the time of the '290 application.  Doc #305 at 5.  UniRAM counters that Shau's characterization (that his invention had been "manufactured")

8

**United States District Court**

For the Northern District of California

properly reflects the invention's development status, as actual semiconductor circuits had been fabricated before the filing date of the '290 application.  See Doc #297, ¶ 17.

In response, TSMC concedes that chips were manufactured, but challenges whether these chips could be characterized as "successful[]" or "unprecedented" in their performance.  Doc #305 at 5.  To undercut Shau's statements to the patent office, TSMC presents to the court a contemporaneous email Shau sent to TSMC, stating that the "first design [was] not worthy of mass production" because he had "failed to make the first silicon fully functional." Doc #285, Ex B.

UniRAM counters that Shau's chips were successfully manufactured because Shau was able to bypass the errors mentioned in his email, rendering Shau able to read and write data to the memory cells in his design.  Doc #297, ¶ 17.  Additionally, the test chip constituted a "commercial memory product," despite not being sold to the public, because it was configured as a commercial design (termed "CacheRAM") and manufactured by a commercial foundry.  Id, ¶ 18.

B

Given the asserted misrepresentations in Shau's grandparent and parent patent applications, the court's analysis proceeds in two steps.  First, the court assesses whether the misrepresentations meet a threshold level of materiality.  Second, the court determines whether the evidence shows a threshold level of intent to mislead the PTO.  See Hoffmann-La Roche, 323 F3d at 1359.  The court then balances materiality and intent:  the more

9

material the omission, the less culpable the intent required, and vice versa.  See <u>Molins PLC v Textron</u>, 48 F3d 1172, 1178 (Fed Cir 1995).

1

The materiality standard does not require that a patent examiner actually rely on the representation in issuing the patent. See <u>Merck & Co v Danbury Pharmacal, Inc</u>, 873 F2d 1418, 1421 (Fed Cir 1989) (rejecting a 'but for' standard of materiality). Instead, a representation is "deemed material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." <u>Brasseler, USA I, L P v Stryker Sales Corp</u>, 267 F3d 1370, 1380 (Fed Cir 2001).  TSMC's materiality theory turns on the statutory requirements of enablement and non-obviousness.  The court addresses these two theories of materiality in turn.

Enablement requires that the patent applicant describe the claimed invention in sufficient detail such that a person of skill in the art could make and use the invention without undue experimentation.  <u>Monsanto Co v Scruggs</u>, 459 F3d 1328, 1337-38 (Fed Cir 2006).  Procedurally, the patent examiner bears the initial burden of identifying a defect in the specification and "setting forth a reasonable explanation as to why [the examiner] believes that the scope of protection provided by that claim is not adequately enabled by the description of the invention provided in the specification of the application." <u>In re Wright</u>, 999 F2d 1557, 1561-62 (Fed Cir 1993).  Then, the burden shifts to the applicant to "provide suitable proof indicating that the specification is

10

indeed enabling."  Id.

TSMC cites Shau's representation that "commercial memory products were manufactured successfully," arguing that "[a]n enablement rejection would be difficult for an examiner where the applicant has sworn that the invention has been built for commercial production."  Doc #271 at 8.  Although "the presence or absence of working examples" is one of eight factors in the enablement test set forth in In re Wands, 858 F2d 731, 373 (Fed Cir 1998), TSMC fails to explain why a reasonable examiner would consider this factor important in deciding whether to issue Shau's patents.

Moreover, by focusing exclusively on Shau's statement in his application, TSMC misconstrues the legal standard. Materiality does not concern the applicant's representation, but rather his *mis*representation.  Hence, TSMC must demonstrate that the gap between Shau's statements to the PTO and the reality of his development efforts would be pertinent to a reasonable examiner's decision on patentability.  Before filing the '620 application Shau claims (and TSMC concedes) that prototypes had been manufactured, which would presumably constitute "the presence * * * of working examples" for the purpose of enablement.  In view of the manufactured prototypes, TSMC fails to explain why adding the term "commercial" would even affect the outcome of an examiner's decision on enablement, much less constitute an "important" factor.

The Federal Circuit addressed an analogous theory of materiality in Regents of Univ of Cal v Eli Lilly & Co, 119 F3d 1559 (Fed Cir 1997).  In Regents, the patent applicant (UC) misstated two examples by representing that the pMB9 plasmid was

United States District Court

For the Northern District of California

used as the cloning vector in a working sample when in fact the pBR322 plasmid was used.  Id at 1570.  In reversing the district court's finding of inequitable conduct, the court noted that there was no allegation of non-enablement.  Id at 1570-71.  Given the nature of UC's application, the court concluded there was "no reason to believe that a reasonable examiner would have made any different decision if US had framed Examples 4 and 5 as constructive examples * * *.  UC's alleged mischaracterization of the pMB9 work as an actual example did not induce the examiner to act, or not to act, in reliance thereon."  Id.

Given the paucity of evidence supporting a non-enablement charge, the court rejects TSMC's assertion that a reasonable examiner would consider the alleged misrepresentation important in deciding whether the application satisfied the enablement requirement.

Alternatively, TSMC contends that a reasonable examiner would have considered important the alleged misstatements in deciding whether to issue an obviousness rejection.  Akin to the procedures under enablement, the examiner bears the initial burden with respect to obviousness.

> During examination, the examiner bears the initial burden of establishing a *prima facie* case of obviousness.  The *prima facie* case is a procedural tool, and requires that the examiner initially produce evidence sufficient to support a ruling of obviousness; thereafter the burden shifts to the applicant to come forward with evidence or argument in rebuttal.  When rebuttal evidence is provided, the *prima facie* case dissolves, and the decision is made on the entirety of the evidence.

In re Kumar, 418 F3d 1361, 1366 (Fed Cir 2005) (internal citations omitted)

**United States District Court**
For the Northern District of California

Rebuttal evidence may show, for example, that the claimed invention achieved unexpected results relative to the prior art, <u>In re Geisler</u>, 116 F3d 1465, 1469-70 (Fed Cir 1997); that the prior art teaches away from the claimed invention, id at 1471; or, as relevant here, that objective evidence (e g, commercial success) supports the conclusion that the invention would not have been obvious to a skilled artisan, <u>In re Piasecki</u>, 745 F2d 1468, 1471 (Fed Cir 1984). Yet, pursuant to the burden-shifting regime set out above, rebuttal evidence is pertinent to a reasonable examiner if (1) the examiner has some basis for a prima facie rejection and (2) the rebuttal evidence is of the caliber the examiner could rely upon in withdrawing the prima facie rejection. Here, TSMC does not contend that the examiner had any basis for issuing a prima facie obviousness rejection; hence, the relevance of the invention's commercial success is attenuated at best.

The Federal Circuit rebuffed a similar materiality argument in <u>CFMT, Inc v Yieldup Int'l Corp</u>, 349 F3d 1333 (Fed Cir 2003). In <u>CFMT</u>, the applicants misrepresented the invention by stating its advantages without disclosing certain data rebutting those advantages (i e, secondary indicia evidence). Id at 1341. The court concluded that secondary evidence was not pertinent because no prima facie case of obviousness existed:

> [T]he examiner concluded that no combination of the prior art, even if supported by a motivation to combine, would disclose all the limitations of the claims. In other words, the examiner detected, in light of all limitations of the claims, no obviousness. Therefore the examiner did not appear to resort to consideration of secondary considerations, such as the unexpected results and advantages in the quoted statements, to surmount the obviousness objection.

United States District Court

For the Northern District of California

Id at 1342 (internal citations omitted).  The logic from CFMT applies here because TSMC does not explain why a reasonable examiner would have detected obviousness, a predicate to the examiner's consideration of secondary factors.

More detrimental to TSMC's materiality theory is Federal Circuit case law that precludes an examiner from giving weight to statements of the kind Shau included in his application.  In re Huang, 100 F3d 135 (Fed Cir 1996), in response to a prima facie obviousness rejection, the applicant sought to establish commercial success through a declaration asserting that 750,000 products had been sold over a five-month period.  Id at 137.  The Federal Circuit affirmed the examiner's rejection of this declaration, reasoning that "[a]lthough Huang's affidavit certainly indicates that many units have been sold, it provides no indication * * * whether this represents a substantial quantity in this market."  Id at 140.  The Huang court further stated that commercial success "is relevant in the obviousness context only if there is proof that the sales were the direct result of the unique characteristics of the claimed invention – as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter."  Id.

In view of the Federal Circuit's exacting standards for establishing commercial success, the court finds that a reasonable examiner would not — indeed, could not — consider the mere existence of a "commercial" product as evidence of commercial success.  Accordingly, Shau's statements in his applications would not be material to a reasonable examiner's decision on obviousness.

14

2

For an inequitable conduct defense to succeed, it is not enough to establish a material false statement to the PTO, a defendant must also establish deceptive intent.  Intent to deceive the PTO need not be proven by direct evidence; it is often proven by a showing of acts, the natural consequences of which are presumably intended by the actor.  Molins PLC v Textron, 48 F3d 1172, 1180 (Fed Cir 1995).  Yet "given the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required."  Northern Telecom, Inc v Datapoint Corp, 908 F2d 931, 939 (Fed Cir 1990).  Also, while intent to deceive the PTO may be found as a matter of inference from circumstantial evidence, such evidence must support a finding of intentional deceit; gross negligence does not suffice.  Kingsdown, 863 F2d at 876 ("[A] finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive").

TSMC's intent argument rests on its charge that "Shau claimed [in his deposition] that his patent application was the 'product' he was claiming to have made [in the grandfather application]."  Doc #271 at 7.  The pertinent deposition testimony is as follows:

TSMC:        As of May 24th, 1996, did Telesis have any
             products at that point in time?  I guess that
             was 24 days into its creation.
Shau:        Can you define what is "product?"
TSMC:        Are you claiming that you had anything that
             you would call a product as of May 24th, 1996
             at Telesis?
Shau:        If patent is – patent application is a
             product, then I claim that I have a product.

Doc #285, Ex A at 212:5-16 (objection omitted)

TSMC interprets this passage to mean that the grandparent patent itself was what Shau referred to in the grandparent application as a "product" and "under production."  The court disagrees with TSMC's odd interpretation of Shau's testimony. Shau's answer did not relate to his use of the word "product" in the grandparent application.  Instead, TSMC's asked whether "anything" constituted a product as of May 24, 1996.  Given that Shau was not part of a foundry like TSMC, it is not surprising that Shau considered the patent application to be a product; to circuit designers, intellectual property *is* the primary "product."

In any event, it is telling that this passage — culled from three days of Shau's deposition testimony - constitutes TSMC's best evidence of deceptive intent.  Such a showing does not provide the court with clear and convincing evidence of conduct sufficient to support an inference of culpable intent.  See <u>Northern Telecom, Inc v Datapoint Corp</u>, 908 F2d 931, 939 (Fed Cir 1990).  Drawing all justifiable inferences in favor of UniRAM, <u>Anderson</u>, 477 US at 255, the court finds that TSMC fails to establish that Shau intended to deceive the PTO.  Accordingly, TSMC neither establishes the requisite level of materiality nor demonstrates the threshold level of intent for a finding of inequitable conduct.

//
//
//
//
//

**United States District Court**

For the Northern District of California

**United States District Court**
For the Northern District of California

IV

   In sum, the court concludes that TSMC fails to demonstrate the threshold level of materiality and intent necessary for a finding of inequitable conduct.  Accordingly, the court DENIES TSMC's motion for summary judgment that the '229 patent is unenforceable due to inequitable conduct.  The court also DENIES UniRAM's motion to strike portions of TSMC's reply brief.  The parties shall appear for a further case management conference on May 1, 2007, at 9:00 am, or at such other time as they may arrange with the courtroom deputy, Ms Cora Klein, 415-522-2039.


   IT IS SO ORDERED.


_____
VAUGHN R WALKER
United States District Chief Judge

17